UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| ANNIE MONETT BALL, | ) | |
|---|---|---|
| *Plaintiff*, | ) | Case No. 3:19-cv-445 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| | ) | Magistrate Judge Guyton |
| COCKE COUNTY, TENNESSEE, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Deputy Max Laughter and Deputy Katrina Baldwin used deadly force against Henry Stroud. Stroud died due to his injuries. Plaintiff Annie Monett Ball, Stroud's mother, sued Defendants Laughter; Baldwin; Deputy Johnathan Ball; Deputy Wes Keys; the City of Newport; and Cocke County, Tennessee alleging violations of her son's constitutional rights pursuant to 42 U.S.C. § 1983. [Doc. 8]. Before the Court is Defendants City of Newport and Johnathan Ball's Motion for Summary Judgment Based Upon Qualified Immunity [Doc. 36] and Motion for Summary Judgment Based Upon Qualified Immunity on Behalf of Max Laughter, Wes Keys, and Katrina Baldwin. [Doc. 40]. For the following reasons, both motions for summary judgment [Docs. 36, 40] are **GRANTED**. All claims against Deputies Laughter, Baldwin, Keys, Ball, and the City of Newport are **DISMISSED WITH PREJUDICE**. Furthermore, both parties are **ORDERED** to brief the issue of whether claims against the remaining defendant—Cocke County—should be dismissed.

I.  **BACKGROUND**

Laugher was working the night shift when, at around midnight, he got dispatched based on a report that a man was walking in the middle of the highway. [Doc. 40-1 at 1]. Johnathan Ball and Laugher were the first officers to arrive on the scene. [*Id.*] At the scene they discovered Stroud. [*Id.* at 2].

Stroud was acting erratically, and he approached the deputies with one arm behind his back. [Ex. B at 0:50–1:00].[1] Laugher repeatedly asked Stroud what he had in his hand and told him to put it down. [*Id.*] Laugher also told Stroud his name and said he would just like to talk. [*Id.*] Stroud did not comply with the order to put the object in his hand down. [*Id.*] Stroud yelled at the deputies throughout the encounter, but most of his speech was unintelligible. [Doc. 40-1 at 2]. However, Laugher heard Stroud yell that he wanted the deputies to shoot and kill him. [*Id.* at 2]. Stroud continued approaching the deputies despite Laugher's orders to stop. [Ex. B at 1:50–1:56].

When Stroud removed his arm behind his back the deputies saw a firearm. [Doc. 40-1 at 2]. Laugher's body camera clearly shows Stroud brandishing a firearm. [Ex. B at 2:00–2:03]. Laugher told Stroud that the object he was holding looked like a firearm. [*Id.* at 2:05–2:10]. Johnathan Ball also reported on his radio that Stroud had a firearm [Ex. A at 0:50–1:00]. Every other deputy on the scene agrees that Stroud had firearm. [Doc. 40-2 at 2; Doc. 40-3 at 2.]

For the next minute, Laugher ordered Stroud to put the firearm down. [Ex. A at 2:03–3:05]. Stroud did not comply. [*Id.*] Stroud then walked to the median into other lanes of traffic. [*Id.*] When he walked over the median Laugher's body camera clearly captured an image of the firearm a second time. [Ex. A at 3:05].

Thirty seconds passed and Stroud moved further into the median. [Ex. A at 3:05–3:35]. Stroud placed an object on the ground. [Doc. 40-1 at 2; Doc. 40-2 at 2; Doc. 40-3 at 2; Doc. 36-1

---

[1] Exhibit A is footage from Johnathan Ball's body camera. Exhibit B is footage from Laugher's body camera.

at 2]. Laughter, Johnathan Ball, Baldwin, and Keys believed the object was a firearm [Doc. 40-1 at 2; Doc. 40-2 at 2; Doc. 40-3 at 2; Doc. 36-1 at 2]. Annie Ball argues it was a different object. [Doc. 48 at 5–6]. After Stroud placed the object down, Laughter told him to approach the police so they could talk. [Ex B at 3:55–4:00]. Stroud reached for the object, and Laughter yelled "Don't do that. Don't do that." [Ex. B at 4:00–4:05; Ex. A at 5:50].

Stroud then picked up and raised the object. [Ex. A at 5:50–5:52]. Annie Ball argues that Stroud raised the object and pointed only at his own head. [Doc. 48] In a statement directly after the arrest, Johnathan Ball told investigators that the Stroud pointed the firearm to his head, and he could not tell if Stroud was going to aim at the deputies. [*Id.* at 3]. Laughter thought that Stroud pointed the firearm at the deputies. [Doc. 40-1 at 3]. Keys and Baldwin thought that Stroud first pointed it at his head then at the deputies. [Doc. 40-2 at 2; Doc. 40-3 at 2]. The video captured by Johnathan Ball's body camera of the incident shows that Stroud raised his hand near his head. [Ex. A at 5:50–52].

Laughter and Baldwin discharged their service weapons. [Doc. 40-1 at 3; Doc. 40-3 at 2]. Keys and Johnathan Ball did not. [Doc. 36-1 at 2; Doc. 40-3 at 2]. Stroud collapsed. Johnathan Ball grabbed his medical equipment and ran over to Stroud. [Ex. A at 6:00–6:30]. He asked the officers nearby if they had found Stroud's firearm. [Ex. A at 6:30]. The deputies responded that they did, and Johnathan Ball's body camera shows that the firearm is lying in the dirt. [Ex. A at 7:00]. Johnathan Ball could not feel Stroud's pulse and determined that he could not provide the medical care necessary to revive Stroud. [Doc. 36-1 at 2]. Stroud was found to be carrying a Powerline $CO_2$ Pistol, but the pistol lacked any distinctive markings that would differentiate it from a real firearm. [Doc. 40-1 at 3].

Annie Ball sued the City of Newport and Cocke County, Tennessee. [Doc. 8]. She also sued Laughter, Keys, Baldwin, and Johnathan Ball in their individual capacities. [*Id.*] She alleges that the individual defendants violated 42 U.S.C. § 1983 by using excessive force. [Doc. 8 at 9]. She further alleges that the municipalities violated § 1983 by failing to train its officers. [*Id.* at 11].

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has met this burden, the nonmoving party cannot rest upon the allegations in the pleadings; rather, they must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence: the Court must determine if a reasonable jury, based on the evidence in the record, could find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough. *Id.*

at 251–52. If a reasonable juror could not find for the nonmovant, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

### III. ANALYSIS

Qualified immunity "shields governmental officials from monetary damages as long as their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 480 (6th Cir. 2017) (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)) (internal quotation marks omitted). In deciding whether a defendant is entitled to qualified immunity, the Court uses a two-part test; the parts may be conducted in either order. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). In part one, the Court determines whether the facts, viewed in the light most favorable to the plaintiff, show that the official violated a constitutional right. *Holzemer v. City of Memphis*, 621 F.3d 512, 519 (6th Cir. 2012). In part two, the Court determines whether the right was clearly established at the time the violation occurred. *Id.* The plaintiff bears the burden proof in "show[ing] that the defendant is not entitled to qualified immunity." *Flint ex rel. Flint v. Ky. Dep't. of Corr.*, 270 F.3d 340, 347 (6th Cir. 2001).

#### A. Deputies Keys and Ball

First, Johnathan Ball argues that he did not fire a shot, and Annie Ball concedes that Johnathan Ball did not shoot at Stroud. [Doc. 46 at 1]. Therefore, Johnathan Ball did not use excessive force against Stroud. Similarly, Keys did not fire a shot, and Annie Ball conceded that Keys did not discharge her service weapon. [Doc. 48 at 16]. Because Keys and Johnathan Ball did not use any force against Stroud, the § 1983 claims against Keys and Johnathan Ball are **DISMISSED WITH PREJUDICE**.

#### B. The City of Newport

To find a municipality liable pursuant to § 1983 for failing to train its officers, there must be an underlying constitutional violation. *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011). Annie Ball has conceded that Johnathan Ball—the only employee of Newport who is in this case—did not violate the constitution. [Doc. 46 at 2]. Annie Ball argues instead that Newport's motion is not ripe for review. [*Id.*] Newport's motion, however, is ripe for review.

To survive these motions for summary judgment, Annie Ball was given the opportunity to conduct a limited discovery to determine if any Defendant was entitled to qualified immunity. [Doc. 31]. While municipalities are not entitled to qualified immunity, Annie Ball would need to prove that the defendants violated the constitution to prevail in her claim against the individual defendants and the municipalities. *Holzemer*, 621 F.3d at 519. Despite having discovery on whether an employee of Newport violated the constitution, Annie Ball failed to present any evidence of the same. Therefore, Defendants City of Newport and Johnathan Ball's Motion for Summary Judgment Based upon Qualified Immunity [Doc. 36] is **GRANTED**. Annie Ball's claims against Newport are **DISMISSED WITH PREJUDICE**.

### C. Deputies Laughter and Baldwin

Laughter and Baldwin fired their service weapons at Stroud, so it is possible that they violated Stroud's Fourth Amendment Rights by using deadly force against him. *Graham v. Connor*, 490 U.S. 386, 396 (1989). An officer's use of deadly force is reasonable if "in the moments immediately preceding the officer's decision, he has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Wilkerson v. City of Akron, Ohio*, 906 F.3d 477, 482 (6th Cir. 2018) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)) (internal quotation marks omitted). This is an objective inquiry judged from the "perspective of a reasonable officer on the scene, including what the officer knew at the time."

*Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Courts should also consider "the severity of the crime, whether the suspect posed a threat to anyone, and whether he resisted the officers or fled from them." *Wilkerson*, 906 F.3d at 482 (citing *Graham*, 490 U.S. at 396–97).

There are two factual disputes that may affect the reasonableness of the deputies' use of force. First, the Plaintiff's Response to the Motions for Summary Judgment of Deendants [sic] Laughter, Keys, and Baldwin [Doc. 48] seems to imply that the deputies planted the CO2 pistol on Stroud. [*Id* at 7–8]. Second, Annie Ball argues that Stroud never pointed whatever he was holding at the deputies. [*Id*. at 15].

First, the claim that the deputies planted the weapon on Stroud is unreasonable. To create a genuine issue of material fact a plaintiff has to identify evidence that would allow a jury to find that fact. *Chao*, 285 F.3d at 424; *see also* Fed. R. Civ. P. 56(c)(1)(A). Annie Ball does not present any evidence that the firearm was planted. She merely argues that no fingerprint analysis was performed. [Doc. 48 at 15]. But, even if that were sufficient to create a genuine issue of material fact, the video evidence disproves this claim.

When there is indisputable video evidence of a fact, the court "should [view] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). Laughter's body camera clearly shows Stroud brandishing a firearm. [Ex B at 2:03–2:05]. Laughter even says, "it looks like a gun, put it down." [Ex. B at 2:10]. Johnathan Ball told fellow officers "he's got a gun." [Ex. A at 0:50–1:00]. Furthermore, Johnathan Ball's body camera captured that the firearm was in the median, less than a minute after shots are fired. [Ex. A at 7:02]. Even taken in the light most favorable to Annie Ball, the facts demonstrate that Stroud had a firearm. Thus, a reasonable deputy would have perceived that Stroud was armed.[2]

---

[2] Annie Ball's attorneys make another—equally unfounded—accusation. Apparently, Stroud's house was searched a week earlier, and due to some argument between Stroud and the Sheriff, Stroud posted a comment on the Sheriff's

Second, Annie Ball argues that Stroud pointed the weapon—or a different object—to his temple, not at the deputies. [Doc. 48 at 5]. Three of the deputies; Laughter, Baldwin, and Keys; argue that Stroud aimed the firearm at them. [Doc. 40-1 at 3; Doc. 40-2 at 2; Doc. 40-3 at 2]. Here, the video evidence is not indisputable. It is clear that Stroud picked up the firearm that was previously in his hand. It is also clear he raised it. [Ex. A at 5:50–5:52]. But the video does not indisputably show that Stroud pointed the firearm at his head or at the deputies. The video simply is not clear enough to make that conclusion. Therefore, it is reasonable for a juror to conclude that Stroud only pointed the weapon at his head, so the Court will infer that Stroud only pointed the weapon at his head. *See Holzemer*, 621 F.3d at 519.

With these facts, it is clear that Laughter and Baldwin did not violate the constitution. Stroud was acting erratically; he was clearly in an agitated state. [Ex. A; Ex. B]. He was shouting that he wanted to be shot. [Doc. 40-1 at 2]. He was not complying with orders from Deputy Laughter to put down his weapon. Instead, he brandished the firearm. [Ex. B at 1:00–2:05]. When he finally complied and put the firearm down, he quickly reversed his decision. [Ex. A at 5:50–5:52]. He picked up the firearm and raised it. [*Id.*] At that point, the deputies had probable cause to conclude that Stroud "posed a threat of serious physical harm." *Garner*, 471 U.S. at 11.

While the Court is assuming that Stroud did not point the firearm directly at the deputies, the deputies still reasonably used deadly force. The Sixth Circuit has been clear that deadly force can be reasonable even if the suspect does not point a firearm at the officers. *Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018); *See also Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("[A]n officer does not have to wait until a gun is pointed at the officer

---

Facebook page. [Doc. 48 at 15]. They argue that the Sheriff was also threatening the mother of Stroud's child. [*Id.*] They then argue that a jury could find "the shooting was an intentional act to silence Stroud permanently." [*Id.*] That claim is not supported by any evidence. It is nothing more than an unfounded conspiracy theory. And this conspiracy theory does not give rise to a genuine dispute of material fact.

before the officer is entitled to take action.") A suspect does not even have to raise the firearm. *See, e.g.*, *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 366–67 (6th Cir. 2017) (holding that an officer reasonably used deadly force when an individual ran at him with a firearm at his side); *Thornton*, 727 F. App'x at 837 (holding that an officer's use of deadly force was reasonable when a suspect had a shotgun not pointed at the officers). Officers are, of course, not entitled to use deadly force against any individual who happens to have a weapon. But the Court views the evidence to determine if, under the totality of the circumstances, the use of force was reasonable. *Thomas*, 854 F.3d at 367.

Here, Stroud posed a danger. He raised what the deputies thought was a firearm. The fact that it was raised, and no longer behind his back, meant that—within seconds—Stroud could have fired upon the deputies. *See Id.*; *Wilkerson*, 906 F.3d at 478. They would have no time to react if Stroud decided to lower the weapon, and Stroud's erratic behavior and failure to follow instructions gave them a reasonable fear that Stroud posed a threat. A reasonable officer would have feared for their safety.[3]

The cases cited by Annie Ball do not support a different conclusion. In *Graves v. Malone*, 810 F. App'x 414, 422 (6th Cir. 2020) *petition for cert. filed Sergeant Gary Hedger, et al., v. Ronald Graves*, (U.S. Oct. 19, 2020) (No. 20-578), the Sixth Circuit held that an officer violated the Fourth Amendment when he used deadly force against the suspect. But, in this case the suspect was in a bathtub, stationary, and incapacitated. *Id.* The suspect then raised a small, plastic, object that "bore little likeness to a gun," and the police officer who shot at the suspect even testified that

---

[3] The fact that the firearm happened to be a CO2 pistol is also immaterial. The CO2 pistol looked like a real weapon and Annie Ball does not argue that a reasonable officer would have perceived it to be a CO2 pistol. Reasonable officers can still mistake the exact nature of a weapon or an object and not violate the constitution. *See Simmonds v. Genesee Cnty.*, 682 F.3d 438, 445 (6th Cir. 2012) (holding that it was reasonable for an officer to use deadly force on a suspect who had a cellphone that looked, in the moment, like a handgun).

"he had no reason to believe the object was a gun." *Id.* In this case, Stroud was not incapacitated. Also, the "object" in his hand resembled a deadly handgun such that no reasonable officer could tell that it was, in fact, harmless. Therefore, *Graves* lends no support to Plaintiffs theories.

The district court opinions cited by Annie Ball fare no better. In *Nunez v. Santos*, 427 F. Supp. 3d 1165, 1184–86 (N.D. Calif. 2019) a jury held that officers used excessive force by shooting a man who was suicidal. In that case, the officers shot the man after the man shot himself in the head twice. *Id.* at 1178. The jury found that, at the time of the shooting, the man's hands were at his side, and officers noted that he was acting and moving sluggishly. *Id.* at 1184–86. This case does not stand for the proposition that officers cannot use deadly force against someone who raises a weapon to their head: when the officers fired the man had his hands at his side and, due to his already grievous injuries, he was moving slowly. In this case, however, Stroud quickly raised a firearm to his head. That behavior made it reasonable for officers to fear that Stroud posed a serious risk of harm.

The final case is *Cole v. Hunter*, 68 F. Supp. 3d 628, 645–46 (N.D. Texas 2014) *overturned on other grounds Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) (en banc). In this case, the Court held that officers violated the constitution when they shot a teenager who was holding a firearm to his head. *Id.* at 644. In that case, however, there were genuine issues of material fact as to whether the teenager was given time to respond to commands and if he was even aware of the officers. *Id.* at 645. Stroud, on the other hand, was fully aware of the officers and had already ignored their commands: his conduct demonstrated that he was more dangerous.

There is no genuine issue of material fact that Laughter and Baldwin had "probable cause to believe that the suspect poses a threat of serious physical harm." *Garner*, 471 U.S. at 11. Therefore, Laughter and Baldwin did not violate Stroud's constitutional rights, and the Court does

not need to determine if that constitutional right was clearly established. *Sumpter*, 868 F.3d at 480. Thus, the Motion for Summary Judgment Based Upon Qualified Immunity on Behalf of Max Laughter, Wes Keys, and Katrina Baldwin [Doc. 40] is **GRANTED**. Annie Ball's § 1983 claims against Max Laughter, Wes Keys, and Katrina Baldwin are **DISMISSED WITH PREJUDICE**.

### IV. CONCLUSION

For the reasons stated, Defendants City of Newport and Johnathan Ball's Motion for Summary Judgment Based upon Qualified Immunity is **GRANTED**. [Doc. 36]. The Motion for Summary Judgment Based Upon Qualified Immunity on Behalf of Max Laughter, Wes Keys, and Katrina Baldwin is **GRANTED**. [Doc. 40]. All claims against Laughter, Baldwin, Keys, Johnathan Ball, and the City of Newport are **DISMISSED WITH PREJUDICE**.

Cocke County did not move for summary judgment. But the fact that no employee of Cocke County violated Stroud's Constitutional Rights may be outcome determinative in any claim against Cocke County. Therefore, both parties are **ORDERED** to brief the issue of whether claims against Cocke County should be dismissed. Cocke County **SHALL** file a brief on or before **March 18, 2021** stating whether the Court should dismiss the claims against it. If Cocke County argues that the Court should dismiss the case, Annie Ball **SHALL RESPOND** to Cocke County within **21 days** after its brief is filed. Cocke County can reply to that brief if its reply is filed within **seven days** after service of the response.

SO ORDERED.

                        */s/ Charles E. Atchley Jr.*
                        **CHARLES E. ATCHLEY, JR.**
                        **UNITED STATES DISTRICT JUDGE**